May it please the court, Jordan Smith on behalf of the plaintiffs appellants. I'll try and reserve about three minutes of my time for rebuttal. When we are in a government shutdown like we are today, it's easy for the American public to realize the central feature that the appropriations clause plays in the separation of powers. But back in 2008, Congress created the FHFA and made it accountable to no one, not even its own power of the purse. Congress even went so far as to say the assessments that the FHFA shall not be construed as appropriated money. But the text, history, and the Supreme Court's recent opinion in CFPB confirm that a valid appropriation requires a cap, a some certain, or other ascertainable limit on how much an agency can raise and spend. So counsel, where in that Supreme Court case is the cap part a part of the holding? Part of the holding, your honor, certainly. Well, the bottom line of CFPB is that the court affirmed a funding mechanism with a cap. Well, they did, but they also stated the rule of law, which was based on the Constitution's text, the history, and congressional practice. We conclude that appropriations need only identify a source of public funds and authorize the expenditure of those funds for designated purposes to satisfy the appropriations clause. The court says that several times in the opinion, and although you're correct that the case involved a cap, Justice Thomas stated the holding of the court several times, and it doesn't include that there needs to be a cap. So how can we read that into the Supreme Court's opinion as a requirement? I'd put your honor to page 437 of the opinion, or excuse me, 436 of the opinion, where the court said we conclude that Congress did not violate the appropriations clause by permitting the Bureau to decide how much funding to draw up to a cap. On 435, the page before, the court said that the CFPB's funding mechanism, its design, fits, quote, comfortably with the first Congress because the cap looks like a lump sum appropriation. Also on page 435, the court says that the CFPB's mechanism has the, quote, requisite features of a cap. So I don't dispute that those are parts of what the court wrote, but in the several places where the court very specifically stated what its exact holding was, the cap part is just not there. And I think we would be well out of our lane to interpret the opinion in a way that the court didn't state its holding. Go ahead. Let me push back a little bit on that, your honor. CFPB was written in a circumstance where there was a cap. So the question wasn't, do you need a cap? It is, you have a cap, what else do you need? So the court was addressing what else you need when there is a cap. Yes, the challengers contested, well, the cap is so high it's illusory, but on 436, the court said that's a mistaken premise. The only way in which the director exercises discretion is by how much funding to spend up to a cap. So CFPB was presuming there was a cap answering what else do you need? But the court statement of the holding source and purpose, which my friends on their side count like six times, that wasn't saying you don't need a cap or you never need a cap. It was addressing a circumstance where there already was one. And throughout the case, your honor noted, through the historical analysis, going back to the King's abuses before the glorious revolution, afterwards, the practice in the colonies, the practice in the first Congress, the cap lump sum appropriations, sums not exceeding appropriations featured prominently in the case. So even if it's not a holding, it's certainly not dicta. Those facts were material and directly relevant to the court's ultimate conclusion. But what do you make of, Mr. Smith, what do you make of the fact that, you know, Justice Alito and his dissent pointed out that the majority was, it was chiding the majority for not requiring a cap. He says that 448, nor does the court's interpretation require Congress to set an upper limit on the amount of money that the executive may take. So that issue did come up in the context of how should the majority construe or define its holding. And there's just, as Judge Bennett was pointing out, there's nothing about a cap in the holding itself. And the dissent was critical of it. I think the majority answered, Justice Alito, at 436, where it said it's a mistaken premise that the only way the director exercises discretion is up to a cap. So the cap featured prominently throughout, recognized it was there. So yes, Justice Alito said there is no cap. I think that's wrong on the majority. And I think the repeated references to the existence of the cap here answers the question for Justice Alito. But it's important that CFPB be read against the backdrop of text and history. So if CFPB didn't have a holding of a cap and it was just addressing source and purpose, then the alternative is the cap is an open question. And the court should answer that question looking at text and history. And I think Alexander Hamilton said it best. And the quote I'm referring to comes from page 46 of my colleague's answering brief, the Second Circuit's decision in the law office of Crystal Moroney case, where Hamilton said that the design of the appropriation clause was to secure a purpose, a limit, and a fund. That's what Hamilton said the appropriation was to do. Here we have a limit, which is sufficient to provide for a reasonable cost. So why is that not enough, even assuming that a cap was somehow germane to CFSA, which I don't think it was? Your Honor, I think the sufficiency and the reasonableness, whether those suffice to be a limit, that goes to the non-delegation arguments. That's a little bit different for the appropriation clause arguments. For the appropriation clause, there has to be some type of numeric limit or a cap, some certain formula that bounds how much an agency can raise and spend. Sufficiency and reasonableness goes to the non-delegation questions. And there, I would just compare and contrast this circumstance with sufficiency from the FCC circumstance with sufficiency. And I want to be clear on this. We're not arguing that sufficiency could never be part of an intelligible principle, or that reasonableness could never be part of an intelligible principle. It just isn't part of an intelligible principle here. FCC versus consumer research says you look at sufficiency, and then as Justice Kagan said, sufficient for what? And then you've got to look at what bounds, meets and bounds, Congress provided by statute in association with sufficiency. And there you had section 254, where it said sufficient and had four criteria and six principles. And in FCC, it said that was enough. Here you have sufficient and you have reasonable, and in 4516A, you have a non-exhaustive list of activities. At page 48 of their answering brief, they recognize those are just examples. That's not an exhaustive list of everything the FHA can do. The district court, in its order 23 of the record, also acknowledged those are just examples. And the conservatorship activities aren't even listed among them. And I think it's helpful to put a point on the non-delegation by comparing FCC and FHFA using the district court's golden stapler analogy that he kind of scoffed at. If in FCC, the FCC wanted to give every American a gold cell phone, you'd say, okay, well, let's look at those four criteria and six principles. Two of those criteria were they have to be in use by a majority of households, and they have to be deployed by carriers. So let's look. Are golden cell phones used by a majority of households? No. Are they actually being deployed by carriers? No. So if the FCC wanted to do that, you'd say you've exceeded congressional bounds. Look at this statute at 4516. Where is the same type of textual limit that would prevent the FHFA from using gold staplers? There simply isn't one. But going back to the appropriations clause issue in text and history, as I was saying, Hamilton recognized a source, a limit, and a fund. And that's the exact same way that the state courts interpreted their own analogous state constitutions in the 1800s, that you had to have a source, a limit, and a fund. Well, can we, you know, I mean, I think the district court pointed out that in the majority's opinion, it relied on two historical examples, the customs and the post office. And those don't provide any kind of a limit. And it's an appropriation scheme that relies on drawing funds from its own sources. So why isn't that a historical example that would be applicable here? Because in the post office and the customs, it was Congress who set the price of stamps back then. It was Congress who set a detailed schedule of duties and tonnage. So by setting how much those agencies could bring in, it was capping what it could spend on. Here, the assessment... Well, it's not setting a limit on what could come in. It's just setting a price. And then depending on how many people bought stamps, that would generate the revenue itself. So it's not setting a budgetary cap. It is. Look at the pot. So it's setting a limit on the pot. You can spend whatever ends up in this pot, and you can do it 35 cents at a time for stamps. So that's what your pot is. Here, the FCC or the FHFA has no similar pot. I can charge Fannie and Freddie whatever I want. I pick the amount of the assessments. I can raise them whenever I want to. And I don't even have to limit myself to my annual costs. I can raise above my annual expenses, put it in a working capital fund that the director deems necessary, and invest it with Treasury. That is unlike any other agency. It's even more dangerous than the CFPB. And there's really five attributes of it that make it unique. One, it's a single director agency. The funding is uncapped. It's indefinite. The director picks the amount of the assessments, and it comes from entities that are under conservatorship. These entities can't even push back on the assessments. They can't lobby. They can't sue. The conservatorship prevents these. It's really, instead of regulatory capture, it's the reverse. These entities can't push back. And no state constitution after the framing would have said this is a valid appropriation because it's indefinite in amount. We point to the Nebraska Supreme Court case from 1896 because it considered a scenario where there was an appropriation for so much as necessary, which to me looks a lot like the director can raise sufficiency, can raise reasonableness. And the Nebraska Supreme Court back then, 1896, said it was unaware of a single case under any constitution where that type of indefinite appropriation would have passed muster. And those courts from Nevada, Indiana, Oregon, all over the country reviewed the exact same history that CFPB did and came to the conclusion that an appropriation had to have an ascertainable limit, which is why going back to CFPB at 431 of the decision, the court said the origins of the appropriation clause confirm that an appropriation needed to designate either particular revenues in an identified purpose. Well, we ask, okay, what are particular revenues then? And that very same paragraph in 431, two sentences later, it says some expenditures required the, sorry, some appropriations required the expenditure of a particular amount. So particular revenue, particular amount, and some required a cap. So CFPB, when using the phrase particular revenue or specified revenue, is always saying it in reference of a cap or some type of ceiling. Even Justice Kagan in her concurrence, she relied on the cap. Also, where she said at 442 of the opinion in her concurrence, she said that historically, the executive was given leeway to spend up to a ceiling. So the cap is repeated. Justice Kagan's concurrence was, I think, mainly focused on the fact that there's a variety of examples throughout history about different schemes under the appropriations clause. You know, so not exceeding in different matters. It's, I didn't read it to mean that you had to have a statutory cap as a through line through all these different schemes. I agree with you that she was, Justice Kagan was emphasizing there's been variations on the theme over the years, but all the examples she gave had some type of limit. I don't read her concurrence as one example where there wasn't a limit. All of her examples say historically at 444 of her concurrence, it says in this tradition, perens up to a cap, perens. So even Justice Kagan wasn't pointing to an example that I recall where there didn't need to be some type of ceiling or upper limit on how much an executive agency can spend. I'll reserve the rest of my time. Thank you. Thank you, your honors. Good morning and may it please the court. I'm Michael Johnson from Arnold and Porter representing the Federal Housing Finance Agency. I think the court's discussion with my friend was very enlightening. Two recent Supreme Court decisions separated by just about a year confirmed that the district court correctly dismissed this action and this court should affirm. Its positive authorities, as the court discussed, are CFPB versus CFSA, 601 U.S. 416, that's the 2024 case focused on the appropriations clause. NFCC versus consumers research, that's 145 Supreme Court 2482, the 2025 case focusing on the non-delegation doctrine. Taken separately but also viewed as interacting with each other, which is really, really important here, those two decisions are fully dispositive. We can read the same quotes that the court was asking my friend about, but every time the court states its holding in the CFPB case, it says source and purpose. It does not say source, purpose, and cap. Yes, it does acknowledge that there was a cap in the statute at issue there. That's a statement of facts. When the court states the rule, as Judge Bennett correctly identified, it does not mention anything about a cap. So my friend is left to argue that the Supreme Court must have implicitly meant to impose an additional requirement in addition to the very clear statement of source and purpose that it actually stated. We know that's wrong, as Judge Sanchez noted, because Justice Alito takes the majority to task for that. It says, hey, folks, what are you doing here? You're not requiring a cap, and I think you should. Now, if Justice Thomas had really meant to impose a cap through these oblique references and statements of the facts that my friend mentions, wouldn't he have said, oh, no, no, Justice Alito, you've got it wrong. We actually are requiring a cap. There's nothing like that in the decision. He never responds. When he does engage with the dissent, as Justice Thomas does, he didn't just brush off Justice Alito and say, I don't need to address the points you make. He says, there may be other constitutional checks on Congress's authority to create and fund an administrative agency, but specifying the source and purpose is all the control the Appropriations Clause requires. Source and purpose is all the Appropriations Clause requires, not a cap. Now, when we get to the FCC case, we see an example, among many, Justice Kagan catalogs several, a statute that has no cap. That was the whole focus of that part of the FCC non-delegation doctrine analysis. Did Congress inappropriately exceed its ability to delegate to the FCC because the Universal Service Fund is unlimited in amount? And the answer was no. And the language is quite clear here as well. All agree that Section 254 contains no determinant cap or formula. The plaintiffs argued that invalidated it. Justice Kagan said, this court's precedents foreclosed that argument. All you have to have is an intelligible principle to guide a determination of whether the agency was appropriately following the congressional guidance. And that standard, again, is trained on intelligible principles, not on numerical caps and mathematical formulas. So no cap under Appropriations Clause, no cap under non-delegation doctrine. The plaintiff's argument is that one or both somehow must require a cap. You just can't get there within these two decisions. And I mentioned that it's not just looking at them separately as one addressing Appropriations Clause, the other addressing non-delegation doctrine. There's an important interaction here. And that's because, as Justice Thomas has said in a couple of decisions from 2015, separation of powers decisions, Congress can't delegate authority it does not possess. Congress can't delegate authority it does not possess. Those decisions are Perez versus the Mortgage Bankers Association, that's 575 U.S. 91, and Justice Thomas's concurrence, the relevant language is at 131 to 32. And he summarizes what he was saying in that decision in another 2015 decision, Department of Transportation versus Association of American Railroads, 575 U.S. 43. The relevant language in his concurrence is at page 68. Why is that important? Well, my friend says the Appropriations Clause itself requires a cap or an ascertainable limit. If the clause itself requires a cap or an ascertainable limit, Congress has no authority to make fake appropriations without a cap or an ascertainable limit. But in FCC, the court held that Congress could do that. So if Justice Thomas is right, that Congress can't delegate authority it doesn't have, and my friend were right, that the Appropriations Clause itself requires a cap or an ascertainable limit, then the FCC decision would have had to come out differently because the actual holding is that Congress can properly delegate to an agency the authority to collect funds with no cap or ascertainable limit. So each of those two decisions standing alone, and especially when viewed together, positively refutes the cap theory upon which my friend defends. Mr. Johnson, can I ask you, the agency raised a standing concern, and we as a court have to ensure our own jurisdiction. Does Collins versus Yellen satisfy that concern? No, it doesn't. Because, look, I think we briefed the standing issues pretty thoroughly. I'm happy to discuss them as much as the court would find useful. I don't have a lot to add to the brief, but what Collins looked at was whether entering into a contract was properly within FHFA's authority. And the plaintiff's allegation was, it's outside the authority, and had there not been the contract, we wouldn't have been injured. So there is this straight line, this through line, this direct line of causation between entering into the contract was improper. That's the allegation. Therefore, there wouldn't have been a contract. Therefore, we wouldn't have suffered the losses that they claimed as their injury. Here, you can't make that same causation, traceability, self-inflicted injury, you can't clear that hurdle. Because whether FHFA had the same funding under a different statute, different funding under the same statute, different funding under a different statute, no funding under any statute, didn't exist anymore, or were put into, like, frozen in the carbonite, like in Star Wars, these foreclosures would have been proper. The liens are not, the validity of the liens is not contested. There's no issue with the state law process here. These properties were subject to foreclosure, and whether FHFA did or didn't do anything, had or didn't have any money to spend on any activities, makes no difference to any of that. But I guess my question of that approach is, isn't that a version of what the Supreme Court rejected in Collins about trying to trace it to a statutory defect, or a defect in the statute, as opposed to defendant's conduct? In other words, are we overthinking this? The straightforward argument is, there's an unlawful, unconstitutional appropriation to an agency that sets in motion these foreclosures, and plaintiffs are harmed as a result. And if you're looking at defendant's conduct, that is sufficient for standing purposes. I don't think we're overthinking it, because FHFA doesn't have to do anything, ordinarily doesn't do anything, need not spend a dime. These foreclosures would happen regardless of FHFA's continued funding or continued existence. We can see that in the district court record. I think it's at, these are the notices of default that are the document that really triggers the foreclosure. It's, I think, exhibits 32, 36.2 and 36.18 in the district court record, and they are not in the excerpts of record in this court. But what those show is that, and by the way, plaintiffs acknowledge this at page six in their reply brief, the mechanics of a foreclosure do not involve Fannie Mae or Freddie Mac or FHFA. The foreclosure is conducted by a mortgage servicer, and that would go forward whether FHFA existed or not. Imagine if FHFA just vanished tomorrow. Would all foreclosure activity on Fannie Mae and Freddie Mac loans have to stop? I don't think so. That would make no sense. The loans are in default, the liens are valid, the enforcement mechanism is totally proper under state law. So not only can you not draw that straight line that's required for traceability, you can't draw a curved line, although I guess my inner high school geometry teacher wants to say there's no such thing as a curved line, but you can't draw a sine wave, you can't draw an arc, you can't draw a spiral, you can't draw a dash. They're two parallel lines here. Plaintiff's failure to satisfy the lien leads to the foreclosure, period. Parallel to that, yes, FHFA regulates the housing finance market. It does some stuff that has some relationship to foreclosures, but if FHFA stopped doing all of that because it had no money or because it changed its policy or for any other reason, those foreclosures would go forward. Ironically, what plaintiff really wants is a directive that FHFA spend money to stop those foreclosures. And that's just not, that makes no sense, and that fails the traceability, redressability, and self-inflicted injury requirements of standing. So there is no standing here, but again, you know, plaintiff's claim fails on the merits, and that's primarily what I'm here to tell the court. I want to spend just a moment on the post office statute because I think it's really important here. We hear and we see in the rhetoric that my friend put in the brief and speaks to the and their favorite authority is the 1904 version of words and phrases that says a sum certain, an amount of money, and no more. So they beat that drum of ascertainable cap, but then when it's time to look at the post office statute that the second Congress enacted, second Congress populated by so many of the founders, there's no cap. There's no cap there. The post office could raise an unlimited amount of money, and the postmaster general, if we look at sections two and three of the statute, had enormous discretion in how much to raise and how to spend it. Postmaster general was granted authority to expand the postal network, was granted discretion to determine how to carry the mail, how often to carry the mail, what technology to use. So the postmaster general is given a statute with some policy stuff. Yes, he was the postmaster general. He wasn't the secretary of the Navy, couldn't buy warships, but had to focus on the mail service, and then used his discretion however he would find expedient and proper. Those are the key words. Those translate to reasonable in founding era language, and we've got the same hallmarks here. FHFA similarly has a restricted mission, and so Judge Thomas, I think you're correct. There is a cap here. Even if we think one might be required, there is one. Congress told FHFA what it could do. It could regulate and supervise the housing finance market. And just like the OCC and the FDIC and the National Credit Union Administration and certain parts of the U.S. Treasury do that too using appropriated funding, sometimes uncapped, FHFA can do that as long as it spends money within a reasonable expenses of satisfying its mission that's proper under CFPB and consumer's research. FHFA statutory mission is not limited to the four examples my friend cites. There's an entire 4,500 and 4,600 series that sets forth in exhaustive detail what the agency is authorized to do and what its mission is. When we couple that statutory cabinet authority and limited mission with the language in 4516 that says reasonable expenses sufficient to fulfill that mission are what you can do, that is a cap, and there is no appropriations clause or delegation doctrine violation here. Again, the Court should affirm. Thank you, Your Honors, very much. Thank you. Thank you, Your Honors. I'll briefly touch on standing. Your Honor is exactly right on our theory of standing. I only want to address a couple of the factual references made by my colleague. This idea that FHFA is not involved or doesn't control foreclosures, that's outside the record, outside the pleadings, and at minimum we would be entitled to discovery on that before standing is resolved on the merits. It also contradicts their own public statements. We cite in the briefs the many times their directors have said, especially during COVID, we're going to tell our servicers not to foreclose, we're going to tell Fannie and Freddie not to foreclose. I would point the Court to, I believe it's 715 in the record, which is statements from FHFA's own Inspector General saying that generally we don't get involved in foreclosures, but we reserve the right to review and reverse them. So their own factual statements seem to contradict this idea that FHFA is not involved in foreclosures. We've pled that they have, and at this pleading stage, that is certainly enough. Going back to Judge Bennett's initial question, I'd also point the Court to the very first paragraph in CFPB, where Justice Thomas says, here's what we're reviewing. It describes the funding mechanism of CFPB and says, you know, Congress authorized the Bureau to draw amounts reasonably necessary subject only to an inflation-adjusted cap. He then continues, in this case, we must decide the narrow question of whether this funding mechanism satisfies the appropriations clause, and we find that it does. This funding mechanism being the one with the cap. So at the end of the day, what CFPB did was affirm a funding mechanism with a cap. It didn't say you never need a cap, and if it's not part of the holding, then at minimum, it's an open question, and if it's an open question, I would encourage the Court to look at text and history. My friend on the other side belittles the words and phrases compendium. They don't have an answer to that, and they don't have an answer to the early state court cases either. So if it's open, text and history is on my side, and the District Court should be reversed. Thank you. All right, we thank counsel for their arguments. The case just argued is submitted, and with that, we'll move to the final case.
judges: BENNETT, SANCHEZ, THOMAS